### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. JKB-16-0363 |
| | ) | |
| MONTEL HARVEY, | ) | |
| | ) | |
| a/k/a "Telly," | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S RESPONSE TO MONTEL HARVEY'S PRETRIAL MOTIONS

The defendant, Montel Harvey, a/k/a "Telly," moves to suppress drugs and drug proceeds seized from his person during three separate arrests on November 2, 2012, May 29, 2013, and July 6, 2013. He argues that on all three occasions, the police violated his Fourth Amendment rights by searching him without a valid search warrant or probable cause to arrest him. ECF 231. With respect to the November 2, 2012 arrest, Harvey moves to suppress a statement he made to police officers after he was arrested and advised of his *Miranda* rights. ECF 232. He argues, in the alternative, that he did not make the statement, that he did not receive *Miranda* warnings before he made the statement, and that, even if he made the statement after receiving *Miranda* warnings, it was the fruit of an illegal arrest. Harvey also moves to exclude, on Due Process grounds, allegedly unreliable identifications of him made by two government witnesses while reviewing "photo books" prepared by the police. ECF 233. Finally, Harvey moves to adopt the motions of certain of his co-defendants in this case. ECF 234.

These motions should be denied. *First*, with respect to the motion to suppress drugs and drug proceeds, each of the challenged searches followed a valid arrest based on probable cause to believe Harvey was engaging in illegal drug activity. *Second*, with respect to the motion to

suppress statements, Harvey's statement to police officers on November 2, 2012 was voluntary and admissible, as it followed a knowing waiver of his *Miranda* rights and was not made in response to police interrogation. *Third*, with respect to the motion to suppress identifications, the identifications of Harvey by government witnesses—to the extent they constituted "eyewitness" identifications at all—were highly reliable and were not the product of impermissibly suggestive police-arranged identification procedures. *Finally*, Harvey's motion to adopt the motions of co-defendants in this case should be denied as either lacking in particularity or moot, and to the extent it is granted, the underlying motions should be denied.

I.   **RELEVANT FACTS**

   A.   **November 2, 2012 Arrest**

On the afternoon of November 2, 2012, Detective Wiczulis of the Baltimore Police Department ("BPD") was monitoring a closed circuit television ("CCTV") camera at the intersection of 2400 E. Biddle Street and 1100 N. Milton Avenue in Northeast Baltimore City, an area he knew to be plagued by illegal drug activity. At approximately 4:45 p.m., Detective Wizculis observed Montel Harvey, whom he knew from previous encounters, standing on the corner of 1200 N. Luzerne and 2500 E. Biddle Street. Detective Wizculis watched as a group of older black males approached Harvey and engaged him in conversation. Harvey then led the group westbound on E. Biddle Street. In the middle of the block, Harvey broke away from the group, turned south on N. Milton Street, and entered a row house at 1104 N. Milton Street. Meanwhile, the group of black males walked to the corner store at 1145 N. Milton Street. A short time later, Harvey exited 1104 N. Milton and hurried to 1145 N. Milton Street. He entered the store, and the group of black males followed closely behind him. Approximately ten seconds later, the group of black males exited the store, without having made any purchases from the store. Harvey exited

close behind them, holding U.S. currency in bill form in his hands. He folded the money and put it in his pocket.

Based on his training and experience, Detective Wizculis believed that Harvey had just sold drugs to the group of black males inside the corner store. Detective Wizculis alerted an arrest team consisting of Sergeant Daniel Salefski and Detective Ciotti and provided the description and location of one of the individuals he believed had just purchased drugs from Harvey. Sergeant Salefski located the individual—identified as Larry Williams—and recovered two gel caps of suspected heroin from his pants pocket.[1]

Detective Wizculis, Sergeant Salefski, and three other detectives then located Harvey in the 2500 block of E. Biddle Street and placed him under arrest. They delivered *Miranda* warnings, and Harvey stated he understood his rights. In a search incident to arrest, Sergeant Salefski recovered $169 from Harvey's pants pocket. Harvey asked the officers how they knew he was selling drugs. Detective Wizculis advised Harvey of the CCTV camera, and Harvey replied, "Shit. I didn't think those worked. You should put me on America's Dumbest Drug Dealers."

The officers retrieved the CCTV video of the incident from BPD's Watch Center. A series of screenshots from the video are attached as Exhibit 1 to this memorandum.

    **B.**    **May 29, 2013 Arrest**

On the afternoon of May 29, 2013, BPD Detective Donald Estes was monitoring CCTV camera number 525 at the intersection of E. North Avenue and Barclay Street. Detective Estes was targeting this area because of its reputation as an open-air drug market. At approximately 3:30 p.m., Detective Estes observed a small group of individuals sitting on the steps of a vacant row house in the 400 block of E. North Avenue. Detective Estes was able to identify one of the

---

[1] The BPD's forensic laboratory later confirmed that the substance was, in fact, heroin.

3

individuals in the group as Montel Harvey, whom he knew from previous encounters and arrests.

At approximately 3:36 p.m., Detective Estes observed Harvey and another unknown black male walk northbound across E. North Avenue to the sidewalk on the other side of the street. Harvey reached into his waistband area and removed a clear, plastic bag containing objects consistent with the shape and size of drugs as they are typically packaged for street-level distribution. Detective Estes observed Harvey examine and manipulate the objects before tying up the bag and placing it back into his front waistband area. Detective Estes believed Harvey was stashing illegal drugs in his waistband, or "dip" area, which he knew to be a common practice of street-level drug dealers. He therefore alerted an arrest team consisting of Officer Booth and Officer Emeigh, and requested that they place Harvey under arrest.

As the arrest team was responding to the scene, Detective Estes continued to monitor Harvey, now with CCTV camera number 516, as he walked northbound in the 2100 block of Greenmount Avenue. Detective Estes again observed Harvey remove the plastic bag from his waistband area, examine the objects inside the bag, and place the bag back in his waistband area. As Harvey approached the intersection of Greenmount Avenue and 22nd Street, Officer Booth exited a marked patrol vehicle to place Harvey under arrest. Harvey attempted to flee on foot but was quickly apprehended by Officer Booth. In a search incident to arrest, Officer Booth recovered a clear, plastic sandwich bag containing thirteen blue-top vials of cocaine from Harvey's front waistband area. Officer Booth also recovered $18 from Harvey's pants pocket.

The officers retrieved the CCTV video of the incident from BPD's Watch Center. A series of screenshots from the video are attached as Exhibit 2 to this memorandum.

### C.     July 6, 2013 Arrest

On July 6, 2013 at approximately 2:20 p.m., Officer Booth was monitoring CCTV camera

number 528 at the intersection of Barclay Street and E. Lafayette Street, when he observed Montel Harvey, whom he knew from previous arrests, waving down a gray vehicle. An unknown black male exited the gray vehicle and began to walk and talk with Harvey. Detective Booth observed Harvey pull a plastic sandwich bag out of his front left pocket and retrieve a small object. At the same time, the unknown male reached into his front right pocket and retrieved U.S. currency. The two exchanged the object and the money and immediately separated.

Based on his training and experience, which included the May 29, 2013 arrest discussed above, Detective Booth believed Harvey had just sold drugs to the unknown male, so he asked Officer Rogers and Officer Homestead to help him detain Harvey in order to investigate further. Officer Booth stopped his patrol vehicle in front of Harvey while he was standing at the corner of E. North Avenue and Barclay Street. Harvey immediately began running. After a brief foot chase, Officer Booth apprehended Harvey. As he was being chased, Officers Homestead and Rogers saw Harvey pull a plastic bag out of his left pocket and toss it to the ground. Officer Rogers retrieved the plastic bag, which was found to contain fifteen blue-top vials of suspected cocaine.[2] Harvey was then placed under arrest. In a search incident to arrest, the officers recovered $38 from Harvey's front right pocket.

The officers submitted a form to the BPD Watch Center requesting the CCTV video of the incident. The video is no longer on file with the Watch Center.

II. ARGUMENT

    A. **The Police Had Probable Cause to Arrest and Search Montel Harvey on November 2, 2012, May 29, 2013, and July 6, 2013**

It is a well-established exception to the Fourth Amendment's warrant requirement that the

---

[2] The BPD's forensic laboratory later confirmed that the substance was, in fact, cocaine.

5

police may conduct a full search of a person who is the subject of a lawful custodial arrest based on probable cause. *United States v. Robinson*, 414 U.S. 218, 235 (1973). The exception is based upon the need to disarm the arrestee of weapons and instruments of escape, and prevent him from concealing or destroying evidence of crime. *Id.* Furthermore, as the defendant acknowledges, "where the formal arrest quickly follows the challenged search, it is not important that the search preceded the arrest," so long as the fruits of the search are not "used to justify the arrest." *United States v. Miller*, 925 F.2d 695, 698 & n.2 (4th Cir. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).

In general, a warrantless arrest complies with the Fourth Amendment "where the facts and circumstances within the arresting officer's knowledge are sufficient for a reasonable person to believe that a crime has been or is being committed by the person to be arrested." *Miller*, 925 F.2d at 698. Probable cause means "more than bare suspicion" but "less than evidence which would justify condemnation or conviction." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). It is an objective test that depends upon the "practical considerations of everyday life," and not those on which "legal technicians act." *Id.*; *see also United States v. Gray*, 137 F.3d 765, 770 (4th Cir.) (en banc), *cert. denied*, 525 U.S. 866 (1998). A police officer may draw inferences based on his special training and experience in deciding whether probable cause exists. *United States v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010). An officer's prior interactions with the suspect, and knowledge that the suspect has engaged in similar criminal activity in the past, may also factor in the probable cause analysis. *See Miller*, 925 F.2d at 699–700 & n.4 (fact that officer "knew the [defendant] and knew that she had been involved in illegal narcotics in the past" was relevant to probable cause determination).

Here, there is no question that each of the challenged searches was incident to a lawful

arrest based on probable cause to believe that Harvey was engaged in illegal drug dealing. On each occasion, probable cause was based on several factors, including (1) the heavy volume of drug trafficking in the area, (2) the officers' knowledge that Harvey had engaged in illegal drug trafficking in the same area in the recent past, (3) the officers' observation of suspicious interactions consistent with hand-to-hand drug transactions, or of actual drugs on his person, and (4) on one occasion, Harvey's attempt to flee from police and discard a bag containing vials of suspected cocaine. Courts have routinely upheld warrantless arrests in similar circumstances. *See Johnson*, 599 F.3d at 346–47 (officers had probable cause to arrest the defendant based on a "suspicious series of hand-to-hand contacts" and defendant's attempt to discard an object upon seeing the police approach); *United States v. Lucas*, 778 F.2d 885, 886–88 (D.C. Cir. 1985) (per curiam) (officer's observation that suspect "furtively exchanged" unidentified object, along with officer's experience observing drug-related transactions and his knowledge of previous drug arrests in the area, contributed to a finding of probable cause); *United States v. Green*, 670 F.2d 1148, 1150–53 (D.C. Cir. 1981) (upholding probable cause determination based, in part, on movement of hands "typical of a two-party narcotics transaction," in light of officer's experience in drug enforcement and the transaction's occurrence "in an area noted for the regularity of narcotics trafficking"); *United States v. White*, 655 F.2d 1302, 1303–04 (D.C. Cir. 1981) (defendant's arrest "in a high narcotics area" by "two experienced officers" was supported by probable cause where officers observed an exchange of "currency for a small object"); *Moore v. Hearle*, 639 F. Supp. 2d 352, 356 (S.D.N.Y. 2009) (finding, in a civil rights case, that police had probable cause to arrest because, among other things, officer had knowledge of suspect's criminal history, suspect displayed nervous behavior, and officer observed suspect make a hand-to-hand exchange in a high-crime area); *United States v. Blue*, Crim. No. ELH-11-0508, 2015 WL 877729,

at *14 (D. Md. Feb. 27, 2015) (finding that there was probable cause to arrest, and noting that "it was quite reasonable for [officers] to infer, based on the totality of the circumstances, that a hand-to-hand drug transaction occurred" even though they could not "identify the object" that changed hands).[3]

### B. Montel Harvey's Post-*Miranda* Statement to the Police on November 2, 2012 Was Voluntary and Admissible

In order to protect the right granted by the Fifth Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, U.S. Const. amend. V, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), adopted prophylactic procedural rules that must be followed in custodial interrogations. *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief. *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*. 384 U.S. at 478.

Statements made after a *Miranda* waiver must also be voluntary. An incriminating statement is deemed involuntary only if the suspect's "will has been overborne" or "his capacity

---

[3] Blue's conviction was reversed on appeal on other grounds. *See United States v. Blue*, 808 F.3d 226 (4th Cir. 2015).

8

for self-determination critically impaired" by police conduct. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "Coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Examples of coercive police activity include prolonged detention and interrogation without sleep or rest, administration of "truth serums," physical abuse, and threats of physical abuse. *See Cristobal*, 293 F.3d at 140.

In this case, the admissibility of Harvey's statement that he should be on "America's Dumbest Drug Dealers" is not a close question. Harvey made the statement after being advised of his *Miranda* rights, and, more importantly, he did not make the statement in response to police interrogation. Rather, the statement was an unprompted wisecrack that would be admissible even in the absence of *Miranda* warnings. *See Innis*, 446 U.S. at 301–02; *Miranda*, 384 U.S. at 478. Harvey himself initiated the conversation by asking how the officers knew he was selling drugs. Detective Wiczulis's response that he had been operating a CCTV camera in the area was not the type of statement that police should know is reasonably likely to elicit an incriminating response from the suspect. *See United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) (agent's declaratory statement that a gun was found in the defendant's house was not *Miranda* interrogation); *cf. Innis*, 446 U.S. at 301 (conversation between two officers in the defendant's presence was not interrogation for *Miranda* purposes). There is no allegation that Harvey's statement was the product of compelling influences, psychological ploys, or even direct questioning. Accordingly, Harvey's motion to suppress the statement statement should be denied.

    **C.**    **The "Photo Books" the Police Showed to Alexis Roberts and James Cornish Were Not Impermissibly Suggestive, and, in Any Event, the Witnesses' Identifications of Harvey Were Reliable**

In general, "[t]he Constitution . . . protects a defendant against a conviction based on

9

evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). The Supreme Court has, however, recognized a limited due process check on the admissibility of eyewitness identifications in cases where the police use an identification procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts follow a two-step analysis for determining whether identification testimony is inadmissible, *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996), and the defendant bears the burden of proof at both stages, *United States v. Johnson*, 114 F.3d 435, 441 (4th Cir. 1997). First, the defendant must establish that the identification procedure was impermissibly suggestive. *Manson v. Brathwaite*, 432 U.S. 98, 110 (1977); *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972). Second, the defendant must establish that the suggestive identification procedure rendered the identification unreliable. *Brathwaite*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199.

In evaluating the reliability of the identification, courts are to consider the "totality of the circumstances," including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200. "[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," the identification evidence should be admitted. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012); *see also Brathwaite*, 432 U.S. at 106 (holding that the central question is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive").

10

Exclusion of identification evidence is a "drastic sanction" that is "limited to identification testimony which is manifestly suspect." *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986). In the only case in which the Supreme Court has held that an identification procedure violated due process, police first arranged a three-man lineup in which the defendant was considerably taller than the other two men and was the only person wearing clothing similar to the suspect. *Foster v. California*, 394 U.S. 440, 442–43 (1969). When that did not result in a positive identification, the police allowed a one-on-one confrontation between the witness and the defendant, and then followed it with another lineup in which the defendant was the only person who had participated in the first lineup. *Id.* The Supreme Court held that "[t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [the defendant]," reasoning that, "[i]n effect, the police repeatedly said to the witness, 'This is the man.'" *Id.*; *see also United States v. Wade*, 388 U.S. 218, 232–33 (1967) (providing, as examples of suggestive identification procedures, those in which "the other participants in a lineup were grossly dissimilar in appearance to the suspect," where "only the suspect was required to wear distinctive clothing which the culprit allegedly wore," or where "the suspect is pointed out before or during a lineup").

Conversely, courts have frequently held that witness identifications were reliable and admissible notwithstanding identification procedures that were unduly suggestive. In *Biggers*, for instance, police called a rape victim to the police station seven months after the incident for a "showup" in which they walked the defendant past the victim and directed him to say the words used by the perpetrator during the crime. 409 U.S. at 194–95. The Court held that notwithstanding the improper showup, the victim's identification was reliable and admissible because she saw her assailant for a considerable period of time under adequate light, provided police with a detailed description of her attacker long before the showup, and had "no doubt" that the defendant was the

11

person she had seen. *Id.* at 200–01.

Similarly, in *Brathwaite*, an undercover officer identified a drug dealer from whom he had purchased drugs after viewing a single photograph shown to him by a fellow officer. 432 U.S. at 100–01. Despite the suggestiveness of the procedure, the Court held that the officer's identification was reliable because he had viewed the defendant in good light for several minutes, provided a thorough description of the suspect, and was certain of his identification, which was made only two days later. *Id.* at 114–15; *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (notwithstanding less-than-ideal identification procedure in which the defendant appeared several times in a series of six photographs, bank tellers' identifications were reliable where they had ample opportunity to view the robber in good lighting, viewed the photographs only a day later, and did not display any doubt in their choice); *United States v. Saunders*, 501 F.3d 384, 390–93 (4th Cir. 2007) (despite unduly suggestive photo array in which defendant's photo "stood out sharply from the others" in lighting and background color and police indicated the array contained the perpetrator, cashier's identification was reliable where he had a good opportunity to view the robber, provided a "generally accurate" description, and confidently identified the defendant two days after the robbery).

### 1. *The Photo Books Were Not Impermissibly Suggestive.*

As a threshold matter, Harvey cannot show that the photo books were impermissibly suggestive. In fact, the identifications by Alexis Roberts and James Cornish were not really "eyewitness" identifications at all. Neither Roberts nor Cornish was a witness to a discrete criminal episode that the police were investigating at the time the photo books were completed. The police simply asked Roberts and Cornish to review book filled with photographs of known local offenders and to identify anyone they knew. Both Roberts and Cornish were familiar with

Harvey from the Greenmount Avenue neighborhood, and both identified him as a member of BGF. Harvey was only one of several people they identified. The test for reliability laid out in *Simmons* and subsequent cases has little relevance in this context. Harvey does not cite a single case in which a court has found that a photo *book*, as opposed to a photo *array*, was impermissibly suggestive, and the government is not aware of any. Harvey's photograph may have been visually distinctive from the others in the book, but it would not matter because the purpose of the exercise was not to single out any one suspect as the perpetrator of a particular crime. Indeed, Harvey does not even attempt to compare his photograph to those of other subjects in the book, perhaps recognizing that it would be a futile exercise.

### 2. *In Any Event, the Witnesses' Identifications Were Reliable.*

Even if the photo books could be considered suggestive in some way, the witnesses' identifications were unquestionably reliable when considering the totality of the circumstances. Both witnesses had ample opportunity to view Harvey, as they had interacted with him on a regular basis in the Greenmount Avenue neighborhood. Both confidently identified Harvey by name ("Telly") upon seeing his photograph.

The Fourth Circuit has consistently held that witness identifications are reliable despite suggestive photo arrays in cases where the witness is familiar with the suspect based on prior encounters. *See, e.g.*, *United States v. Van Harris*, 515 Fed. Appx. 204, 206–07 (4th Cir. 2013) (unpub.) (witness' identification was reliable where the witness "was familiar with the Defendant from prior incidents" and "was able to describe the Defendant's physical characteristics and provided the Defendant's first name and address"); *United States v. Garcia*, 598 Fed. Appx. 861, 862 (4th Cir. 2015) (unpub.) (witness' identification was reliable where witness "had multiple opportunities to familiarize himself with [the defendant's] appearance" and was certain of his

identification); *United States v. Simmons*, 380 Fed. Appx. 323, 329 (4th Cir. 2010) (unpub.) (witness' identification was reliable where the witness "was personally familiar with [the defendant]," was able to identify him by name as the perpetrator, and was certain of his identification); *United States v. Hawkins*, 116 F.3d 473 (4th Cir. 1997) (unpub.) (per curiam) (witnesses' identifications were reliable where they were familiar with the defendant from prior encounters).

Here, Roberts and Cornish were familiar with Harvey from prior encounters and knew him by name, making it highly improbable that they would be led astray by a police identification procedure, no matter how suggestive. Under these circumstances, the identifications were highly reliable, and should therefore be admitted for the jury to determine their worth in light of any allegedly suggestive police techniques. *See Perry*, 565 U.S. at 239 ("when an 'identification is reliable despite an unnecessarily suggestive [police] identification procedure,' automatic exclusion 'is a Draconian sanction,' one 'that may frustrate rather than promote justice'") (quoting *Brathwaite*, 432 U.S. at 113).

### D. Harvey's Motion to Adopt the Motions of Co-Defendants Should Be Denied, and to the Extent It Is Granted, the Adopted Motions Should Be Denied

Harvey moves to adopt various motions filed by his co-defendants in the case. Although the government does not object to the adoption of motions of general applicability, a defendant must particularize his basis for adopting a co-defendant's motions to the extent he is relying on different facts or authorities. *See United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *United States v. Randle*, 966, F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality. Reliance on vague, conclusory allegations is insufficient.")

Here, Harvey's motion to adopt the motions for severance filed by Kenneth Jones, Marquise McCants, and Gerald Johnson (ECF 192, 201, 217) should be denied because Harvey has failed to particularize his basis for adopting those motions. The determination whether a defendant should be severed is highly fact-specific, and Harvey has not come close to carrying his heavy burden of establishing that a joint trial would be prejudicial *in his specific case*. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993) (severance of properly joined defendants is justified "only if there is a serious risk that a joint trial would compromise a *specific* trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence" (emphasis added)). Alternatively, if Harvey's motion to adopt is granted, the adopted motion should be denied for the reasons stated in Section III.a of the Government's Consolidated Response to the Defendants' Pretrial Motions. *See* ECF 244, at 20–26.

Harvey's motion to adopt Jones' and McCants' motions for disclosures pursuant to Federal Rules of Evidence 404(b) and 609 (ECF 188, 206) should be denied as moot based on the information provided in Sections III.d and III.e of the Government's Consolidated Response to the Defendants' Pretrial Motions. *See* ECF 244, at 120–123.

Harvey's motion to adopt McCants' motions for the disclosure of informants and co-conspirator statements (ECF 197, 198) should also be denied as moot, as those motions have now been withdrawn. *See* ECF 238, 241.

Finally, the government does not oppose Harvey's motion to adopt McCants' motion to dismiss Count One of the Superseding Indictment (ECF 199), as this is a purely legal motion of general applicability. However, should the Court grant the motion to adopt, the adopted motion should be denied for the reasons stated in Section III.c of the Government's Consolidated Response to the Defendants' Pretrial Motions. *See* ECF 244, at 116–19.

### III.  CONCLUSION

For the foregoing reasons, all of Harvey's motions should be denied.

                            Respectfully submitted,

                            Stephen M. Schenning
                            Acting United States Attorney

By: _____
                            Christina A. Hoffman
                            Peter J. Martinez
                            Assistant United States Attorneys
                            36 South Charles Street, Fourth Floor
                            Baltimore, Maryland  21201
                            (410) 209-4800

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of September, 2017, I caused a copy of the foregoing response to be served on defense counsel through the electronic case filing system.

                                                                               _____
                                                                               Christina A. Hoffman
                                                                               Assistant United States Attorney